## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 08-61851-CIV-LENARD/GARBER

**MAROLIE BORDEN and WILLIAM
BORDEN**,

       Plaintiffs,

v.

**SAXON MORTGAGE SERVICES,
INC., et al.,**

       Defendants.

_____/

## OMNIBUS ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (D.E. 109)

**THIS CAUSE** is before the Court on Defendants Saxon Mortgage Services, Inc.

("Saxon") and Deutsche Bank National Trust Company's ("Deutsche"), as trustee for

NATIXIS Real Estate Capital Trust 2007-HE2, (collectively "Defendants") Motion for

Summary Judgment ("Motion," D.E. 109), filed on September 17, 2009.  On October 5,

2009, Plaintiffs filed their response in opposition ("Response," D.E. 119),[1] to which

---

[1]    In response to Defendants' motion for summary judgment, Plaintiffs submitted their memorandum along with an affidavit from Marlowe C. Moreland ("Moreland").  (See D.E. 119-1.)  The affidavit identifies Moreland as an expert witness although she has not yet been qualified as such and Defendants have moved to strike her expert report.  (See D.E. 127.)  Rule 56(e)(1) of the Federal Rules of Civil Procedure provides that "[a] supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  The affidavit is of limited value given it does not appear to be based on personal knowledge, repeatedly states legal conclusions, and provides more argument than fact.

Defendants filed their reply ("Reply," D.E. 122) on October 13, 2009.[2]  Having considered the Motion, the Response, the Reply, and the record, the Court finds as follows.

## I.   Background[3]

Plaintiffs Marolie and William Borden ("Bordens") have resided at their home at 9401 N.W. 5th Street, Pembroke Pines, Florida, since approximately 1989.  On September 21, 2006, the Bordens refinanced their home for the second time through a mortgage loan transaction with defendant Master Financial, Inc. ("Master Financial").[4]  The terms of the loan included an original principal balance of $300,000 and a fixed interest rate of 9.6% over thirty years.  At the time Plaintiffs refinanced their home with Master Financial, their original loan with Ameriquest had an unpaid balance of $168,457.93.  With the loan principal received from Master Financial, the Bordens paid off the remaining balance of the loan with Ameriquest and were able to walk away with $100,000 in cash.

The Bordens were assisted in procuring their loan by Nancy Avila ("Avila"), a

---

[2]     Along with their Motion, Defendants filed their Statement of Undisputed Facts ("Def. SOF," D.E. 112), in compliance with Local Rule 7.5(C).  Plaintiffs filed their Statement of Material Facts in Dispute ("Pl. SOF," D.E. 120) on October 5, 2009.  Defendants also filed a Reply to Plaintiffs' Statement of Material Facts in Dispute ("Def. SOF Reply," D.E. 123), on October 13, 2009.  In general, Plaintiffs assert that much of Defendants' stated facts are disputed but for the most part object only to the characterization of facts and not the underlying facts or circumstances themselves.  For example, Para. 9 of Def. SOF contends the Bordens executed a Note and Mortgage in connection with the loan and cites to several provisions of the Note.  The Bordens dispute the facts contained in this paragraph but on the grounds, "it does not accurately portray the events that transpired at closing."  (Pl. SOF at ¶ 9.)

[3]     The following facts are undisputed unless otherwise noted.

[4]     On August 18, 2009, the Court granted default final judgment against Master Financial.  (See D.E. 94.)

mortgage broker for defendant Atlantic Pioneer Mortgage, Inc. ("Atlantic Pioneer").[5] Neither Avila nor Atlantic Pioneer had any relationship with Saxon or Deutsche with respect to the Bordens' loan, prior to the loan assignment. Plaintiffs contend Avila quoted them an interest rate of 8.5%. Defendants believe the only time the Bordens were given an interest rate quote of 8.5% was this initial meeting. Prior to the loan closing, the Bordens received a packet of information in the mail pertaining to the loan. That packet identified Equifirst Corporation, a company entirely unrelated to Master Financial, as the lender.

The closing occurred on September 21, 2006. Marolie Borden contends she was rushed through the process and told to hurry because of another scheduled closing. She also asserts that she was told the documents she was signing were the same ones that she had previously received. As a result, the Bordens did not read the documents and took for granted that Avila was acting on their behalf. Marolie Borden alleges that the entire closing lasted approximately ten minutes and she never asked for time to read the documents because she was pressured to rush through the process. Marolie Borden was approximately 59 years of age at the time of the closing while William Borden was approximately 66 years of age.

On approximately April 30, 2007, the Bordens' loan was assigned to NATIXIS Real Estate Capital Trust 2007-HE2, for which Deutsche acts as trustee. In connection with the loan transaction, the Bordens executed a Note and Mortgage. (See "Note," D.E. 112-3; "Mortgage," D.E. 112-8.) Either the initials "M.B." and "W.B.," or the signatures of Marolie

---

[5]      On April 20, 2009, the Court granted default final judgment against Atlantic Pioneer. (See D.E. 68.)

and William Borden, are found on every page of the Mortgage.  The initials "M.B." are also found on all but the final page of the Note.  The terms of the Note provide that the Bordens were to pay monthly payments of $2,544.48, starting on November 1, 2006, and that the failure to pay the full amount on each due date would place them in default.  (See Note at ¶¶ 3, 6(B).)  The terms of the Mortgage provide that the Bordens would be in default if they or persons acting on their behalf provided materially false information to the Lender. (Mortgage at ¶ 8.)  Defendants contend these provisions are significant because the loan origination file contains a Uniform Residential Loan Application ("Loan Application") signed by the Bordens indicating that as of September 21, 2006, Marolie Borden had been employed at a company called Mastec for over two years and was earning a gross income of $6,735 per month.  (Def. SOF at ¶ 10; Loan Application, D.E. 112-9.)  Defendants assert that the Loan Application indicates it was completed during an in person interview between Avila and the Bordens, and Marolie Borden's deposition testimony confirms that it was completed in her presence.  The Bordens maintain that they were not aware of the documents they were completing and Marolie Borden produced income and employment verification when she applied for the loan documenting that she was employed by a company called The Geo Group, Inc., and received a paycheck of roughly $1,300 every two weeks.  (Pl. SOF ¶ 10.) Defendants contend there was no mention of The Geo Group, Inc., in the loan file and the misrepresentations regarding Marolie Borden's employment are corroborated by other documents in the loan origination file including the Request for Employment Verification

and Employment Verification forms.  The Bordens maintain they had nothing to do with any misrepresentations regarding her employment. Marolie Borden contends she provided accurate employment verification documents to Atlantic Pioneer while Defendants contend the origination file they received fails to contain any documents suggesting she was employed anywhere but Mastec.

The loan origination file also contains a Truth in Lending Act Disclosure Statement ("TILA Disclosure Statement").  Defendants allege the TILA Disclosure Statement, dated September 21, 2006, and signed by the Bordens, explained the loan charges including the 9.862% Annual Percentage Rate ("APR") the Bordens would be paying.  (Def. SOF at ¶ 13; Sept. 21, 2006 TILA Disclosure, D.E. 112-13.) The Bordens generally contend, "[t]he disclosures were not disclosed properly."  (Pl. SOF at ¶ 13.)  Previously, the Bordens had received two other TILA Disclosure Statements.  The first indicates the Lender is "Equifirst" and is dated August 3, 2006.  ("August TILA Disclosure Statement," D.E. 112-14.)  The second is dated September 12, 2006. ("September 12, 2006 TILA Disclosure Statement," D.E. 112-15.)  Both are unsigned and the boxes next to the word "preliminary" are checked on both.

Defendants assert the loan origination file also contains a Notice of Right to Cancel (D.E. 113-1), explaining the Bordens' right to cancel the loan and informing them how to do so.  (Def. SOF at ¶ 15.)  The Bordens allege numerous Truth in Lending Act ("TILA") disclosure violations including allegations that the forms were impossible to read and the

Statement of Non-Rescission document was post-dated for the date of funding.  (Pl. SOF at ¶ 15.)

As of April 2007, the Bordens began making their monthly payments to Saxon[6] although some were untimely and they sometimes failed to make any payment at all.  The Bordens' failure to make all of their payments was due to the fact that Marolie was terminated from her employment in December 2007 and William Borden's social security benefits constituted their only source of income.  Both sides dispute what actions Saxon took with regard to the missed or late payments.  (Def. SOF at ¶ 17; Pl. SOF at ¶ 17.)  The Bordens allege that Saxon would make telephone calls as early as 7:30 a.m. and as late as 10:30 p.m., and that they would call three to four times daily.  Marolie Borden testified at her deposition that the phone calls became so intolerable the Bordens had to disconnect their phone.  On the other hand, Defendant assert that the Bordens have no evidence of the alleged telephone calls aside from Marolie's own deposition testimony.  Saxon's records indicate representatives called the Bordens approximately once per missed payment and that Marolie Borden was always cooperative.

Sometime in January 2008, the Bordens contacted Saxon to inquire about potential resolutions for their delinquent loan payments.  On January 12, 2008, Saxon sent a letter to

---

[6]    Saxon acted as the loan servicer.  It began servicing the loan on approximately April 15, 2007.  (See Ehinger Affidavit, D.E. 112-6 at 2.)  Although the Bordens have objected to the use of this affidavit from Saxon's Senior Vice President Carrie Ehinger, on the basis that it references documents that are not sworn or certified copies, the affidavit also states it is based upon her personal knowledge and the assertion herein referenced does not refer "to a paper or part of a paper."  See Fed. R. Civ. P. 56(e)(1).

the Bordens setting forth several options for resolving their delinquency. (D.E. 113-6.)  The

letter attached a financial worksheet for the Bordens to complete.  The purpose of the

worksheet was to determine whether the Bordens were eligible for a loan modification.  On

January 18, 2008, the Bordens completed the financial worksheet, indicating Marolie was

unemployed and the Bordens' only source of income was William's social security benefits

in the amount of $1,442 per month.  As a result, the Bordens did not receive a loan

modification.

On March 21, 2008, the Bordens paid $13,227.30 to bring their loan current.  Since

that time, the Bordens have not made any mortgage payments.  Consequently, the Bordens'

loan was referred to foreclosure and in July 2008 the Bordens received a foreclosure letter

from Deutsche.[7]  Defendants allege the foreclosure letter did not contain any abusive or

harassing language.  They also point to the Bordens' deposition testimony that they were

expecting to receive a foreclosure letter and admitting that they were behind on their

payments.  The Bordens allege that on July 19, 2008, William was admitted to Memorial

Hospital West after experiencing severe chest pains and breathing difficulty.  According to

William Borden, he believed at the time that he was having a heart attack.  Defendants

contend William Borden admitted that he did not suffer any adverse symptoms at the time

he read the foreclosure letter and his own testimony and medical records indicate he did not

_____

[7]        Deutsche acts as trustee for the owner of the loan, NATIXIS Real Estate
Capital Trust 2007-HE2.

in fact suffer a heart attack.  Prior to receiving the foreclosure letter, the Bordens had never heard of Deutsche and the July 2008 foreclosure letter is the only oral or written communication between the Bordens and Deutsche.

Approximately three weeks after receiving the foreclosure letter, the Bordens allege that Marolie Borden noticed a woman taking photographs of their home.  (Def. SOF at ¶ 21; Pl. SOF at ¶ 21.)  She testified that she approached the woman who explained she was with the "mortgage company" and was there to take photographs.  Marolie Borden alleges that she suffered a complete emotional breakdown that caused her to experience hours of emotional distress, severe anxiety, breathing difficulty and vomiting as a result of the trespass. Defendants dispute that anyone acting on their behalf was ever physically present on the Bordens' property and the allegations do not support her Consumer Collection Practices Act claim in any event because the unknown woman did not attempt to collect a debt.  The parties dispute whether Marolie Borden suffered a panic attack and whether it was caused by the alleged trespass or the overall circumstances involving the Bordens' financial situation and impending foreclosure.  (Def. SOF at ¶ 22; Pl. SOF at ¶ 22.)

As of September 2009, the Bordens' loan had not been foreclosed upon although a state foreclosure action was pending in the Circuit Court in and for Broward County, Florida, and the Bordens were still residing in their home.

On or about July 18, 2008, the Bordens commenced this action in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida.  On October 29,

2008, the Bordens filed an Amended Complaint ("Complaint," D.E. 17) alleging: (1) violations of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") (against Master Financial and Atlantic Pioneer); (2) violations of the Truth in Lending Act ("TILA") (against all defendants); (3) violation of the right to cancel (against Atlantic Pioneer); (4) violations of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") (against all defendants); (5) violations of Florida's civil Racketeer Influenced and Corrupt Organization ("RICO") statute (against all defendants); (6) intentional infliction of emotional distress (against all defendants); (7) breach of fiduciary duty (against Master Financial and Atlantic Pioneer); (8) violations of FLA. STAT. § 501.2077, Florida's senior citizen consumer protection statute (against all defendants); (9) conspiracy to commit fraud (against all defendants); (10) fraud (against all defendants); (11) rescission (against all defendants); and (12) violations of Florida's Consumer Collection Practices Act ("FCCPA") (against Saxon).  On November 17, 2008, Defendants removed this action to federal court. (See Notice of Removal, D.E. 1.)  The same day, Defendants also filed their Answer to the Complaint.  (See Answer, D.E. 4.)  On August 11, 2009, with leave from the Court and with the consent of the Bordens, Defendants filed an Amended Answer and Counterclaim, asserting counterclaims for breach of contract, fraud, and negligent misrepresentation against the Bordens.  (See "Counterclaim," D.E. 89.)  Defendants have now moved for summary judgment on all of the Bordens' claims against them.

## II.   Motion for Summary Judgment

Defendants Motion seeks summary judgment on all claims against Saxon and Deutsche.[8]  Defendants assert that the Bordens' TILA claims must be dismissed because servicers such as Saxon, with no ownership interest in a loan, are exempt from liability under the TILA.  In support, they rely upon 15 U.S.C. § 1641(f) which provides, "[a] servicer of a consumer obligation arising from a consumer credit transaction shall not be treated as an assignee of such obligation for purposes of this section unless the servicer is or was the owner of the obligation."  Defendants also assert that any TILA claims for damages against Deutsche are time-barred by its one year statute of limitations and fail on the merits.  In support of this argument they rely upon 15 U.S.C. § 1640(e) which provides that any action must be brought "within one year from the date of the occurrence of the violation."  The Bordens respond that the inadequate TILA disclosures were only discovered after they retained counsel and a forensic audit performed on their loan and closing documents.  The Bordens further respond that the right to rescind under the TILA is extended to three years after the transaction if the "required notice or material disclosures are not delivered." (Response at 10 (citing 12 C.F.R. § 226.23(a)(3)).)  They also argue that since Defendants have only just recently produced the "Right to Cancel" form signed by Marolie Borden, they are entitled to rescind the loan.  The Bordens further argue that the doctrine of equitable

---

[8]      The Motion addresses all of the claims asserted in the Bordens' Complaint, despite the fact that the Complaint explicitly only seeks relief from Atlantic Pioneer or Master Financial as to the claims for breach of fiduciary duty, right to cancel, and the FIRREA.  The Court need only consider those claims asserted against Defendants raised in the Complaint.

tolling should apply, especially where the Statement of Non-Rescission form included in their closing packet was intentionally misleading and caused them to believe they had waived their right to rescind the loan.

With regard to the Bordens' FDUTPA claim, Defendants contend this claim fails because the Bordens have not alleged any deceptive conduct on the part of Saxon or Deutsche. Rather, the Bordens allege the deceptive conduct occurred during the loan closing, when Saxon and Deutsche were not yet involved. Defendants also point out that Marolie Borden's § 501.2077 claim must be dismissed because it is undisputed that she was not a senior citizen under the statute's definition at the time of the alleged deception. Defendants also contend the Bordens have not provided authority for any argument that conduct in violation of the FCCPA also constitutes a violation of the FDUTPA. In response, the Bordens acknowledge that while Marolie Borden was not a senior citizen under the statute, William Borden was 66 years old at the time.

Defendants argue the Bordens' civil RICO claims fail because the Bordens failed to file a Civil RICO Case Statement pursuant to S.D. Fla. Local Rule 12.1.[9] Defendants also argue there can be no pattern of racketeering activity as there was only one private mortgage transaction alleged in this case. Defendants also contend there is no "enterprise" where there

---

[9]     Local Rule 12.1 requires a party filing a RICO claim shall "within thirty days of the filing (including filing upon removal or transfer) serve a RICO Case Statement," explicitly detailing *inter alia* the facts relied upon to initiate the claim, each defendant and the basis of their liability, each wrongdoer and their misconduct, the victims and their separate injuries, and the pattern of racketeering or criminal activity.

is no conduct outside of Defendants' regular business practice.  The Bordens' sole response is to cite the federal and state RICO statutes and advise that "[t]he Court must consider whether or not these requirements are met."  (Response at 14.)

Defendants argue the Bordens' claim for intentional infliction of emotional distress should be dismissed because there is no evidence of any outrageous conduct or conduct exceeding the bounds of decency.  The Bordens claim is based upon the Defendants' enforcement of their legal rights.  The Bordens admitted they failed to make certain of their mortgage payments and some payments were untimely.  Moreover, Defendants argue the foreclosure letter sent to the Bordens was neither unexpected nor abusive.  Finally, Defendants highlight that William Borden's medical records indicate he did not suffer from a heart attack.  In response, the Bordens maintain they have a valid claim for intentional infliction of emotional distress because Defendants' consistent and harassing telephone calls and trespass upon their property constitute outrageous conduct.  They contend evidence of the harm caused by Saxon's conduct includes William Borden's admission to the hospital with a feared heart attack.

Defendants argue the Bordens' fraud claims fail for several reasons.  First, there is no evidence that Saxon or Deutsche made any fraudulent statements.  The Bordens admitted during their respective depositions that their only contact with Deutsche was the July 2008 foreclosure letter.  The Bordens further admitted that Saxon never made any fraudulent statements to them.  All of the allegedly fraudulent statements were made by Atlantic Pioneer

12

in connection with the origination of the loan.  Second, Defendants contend they cannot be liable for any misrepresentation of Marolie Borden's employment since the Bordens signed the Loan Application at the time of closing and represented to Master Financial that Marolie Borden was employed at Mastec and earning approximately $6,375 per month.  The Loan Application states it was completed during an in person interview with Avila and Marolie Borden confirmed this fact.  Defendants contend that no matter how rushed the Bordens were at the closing they should have at the very least confirmed their own personal information.  Third, Defendants contend that even if the Bordens allegations were true, the alleged false representations that (a) their interest rate would be 8.5%; (b) the loan was a good product for the Bordens; (c) the Bordens would be able to pay off the loan; and (d) the Bordens would be able to refinance the loan," are mere opinions and not statements that support a fraud claim.  Moreover, Defendants argue the Bordens have not demonstrated how any fraud committed by Atlantic Pioneer should or could be imputed to them.  In response, the Bordens allege that "by participating in the servicing and administration" of the loan the Defendants "became active accomplices in the fraud committed against" them.  (Response at 7.)  The Bordens allege Defendants ignored and failed to investigate discrepancies apparent on the face of the loan documents and the fraud should be imputed to Defendants.

Similarly, Defendants argue the Bordens' conspiracy to commit fraud claim fails because there is no underlying tort or fraud.  Furthermore, Defendants contend the conspiracy claim fails because they were not involved in the loan origination and only acquired any

interest in the loan approximately six months after the origination. Thus, there is no evidence Defendants possessed any knowledge of a conspiracy or participated in any such conspiracy. Defendants further argue that just receiving a benefit from a conspiracy does not support such a claim in any event. As with their fraud claims, the Bordens respond that Defendants should be held liable for their deliberate indifference to Master Financial and Atlantic Pioneer's fraudulent activities.

Next, Defendants argue the Bordens are not entitled to rescission of their loan. Defendants argue rescission is not appropriate where the Bordens claims of fraud fail and the Bordens have never provided notice of their intent to rescind the loan prior to filing this lawsuit. The Bordens paid their mortgage payments for more than a year and only stopped paying once Marolie Borden became unemployed. As a result, Defendants contend the Bordens are only now seeking to rescind their loan because they face foreclosure. Defendants also point to the Court's award of default judgment against defendants Atlantic Pioneer and Master Financial, jointly and severally, in the amount of $123,547.06 (or the difference between the loan they say they were promised and the loan they received), as proof that adequate remedies exist at law.

Finally, Defendants contend the Bordens' claim under the FCCPA must fail because Saxon and Deutsche are not "debt collectors" as defined by that Act and Defendants' alleged conduct was not in the course of collecting a consumer debt. Moreover, Defendants raise the argument that the Bordens do not have any evidence of Saxon's allegedly harassing phone

14

calls aside from Marolie Borden's testimony.  Finally, it is undisputed that Deutsche's only communication with the Bordens came in the form of the July 2008 foreclosure letter.  In response, the Bordens claim that Saxon identifies itself as a "debt collector" on its own website and in its own documents.  Therefore, the Bordens believe their FCCPA, as well as the rest of their claims, should survive summary judgment.

### III.    Standard of Review

On a motion for summary judgment, the Court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party.  <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).  Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The Supreme Court has explained the summary judgment standard as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  A dispute about a material fact is genuine if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party. <u>Anderson</u>, 477 U.S. at 248; <u>see also Barfield v. Brierton</u>, 883 F.2d 923, 933 (11th Cir. 1989).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex</u>, 477 U.S. at 323.  Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party.  The nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Id.</u> at 324; <u>see also</u> FED. R. CIV. P. 56(e).  In meeting this burden the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  That party must demonstrate that there is a "genuine issue for trial." <u>Id.</u> at 587.  An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." <u>Id.</u>

## IV. Discussion

### A.    Truth in Lending Act

The Bordens seek damages and rescission under the TILA, 15 U.S.C. § 1601, *et seq.*, as a result of what they say were false, misleading, and incomplete disclosures provided by

16

Defendants.  The Complaint alleges that at the closing they were provided with several different TILA forms, each filled out with different numbers, in an effort to confuse them as unsophisticated borrowers.  (Complaint at ¶ 71.)  Moreover, the Bordens allege that during and after the closing, Master Financial, Atlantic Pioneer, and Saxon failed to deliver all material disclosures required by TILA and Regulation Z, 12 C.F.R. § 226, *et seq.*  (Id. at ¶ 72.)  Specifically, the Complaint alleges the defendants failed to clearly and accurately disclose the (1) amount financed, (2) finance charge, (3) annual percentage rate (including any variable feature disclosure), (3) number, amounts, and timing of payments, (4) total of payments, and (5) misdisclosure of any variable rate feature.  (Id.)  The Bordens allege the failure to make these disclosures prior to the consummation of the loan transaction means Master Financial, Atlantic Pioneer, Saxon, and Deutsche are required to rescind the transaction.  The Complaint alleges the Bordens are within the three-day window as provided in 15 U.S.C. § 1635(a) and Regulation Z.226.15(a)(3) to rescind the loan.

The right to rescind provided under the TILA is described in 15 U.S.C. § 1635, which states in relevant part:

> (a) Disclosure of obligor's right to rescind. Except as otherwise provided in this section, in the case of any consumer credit transaction (including opening or increasing the credit limit for an open end credit plan) in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this title [15 USCS §§ 1601

17

et seq.], whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so. The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.

(b) Return of money or property following rescission. When an obligor exercises his right to rescind under subsection (a), he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it. The procedures prescribed by this subsection shall apply except when otherwise ordered by a court.

The TILA further provides that, "[a] servicer of a consumer obligation arising from a consumer credit transaction shall not be treated as an assignee of such obligation for purposes of this section unless the servicer is or was the owner of the obligation." 15 U.S.C. § 1641(f).

As an initial matter, the Court finds Saxon is entitled to summary judgment on the TILA claims against it. The Bordens do not contest that Saxon is exempt from liability for their claims as a loan servicer pursuant to 15 U.S.C. § 1641(f). Additionally, the Bordens have not offered any evidence or alleged that Saxon was an "owner of the obligation." Thus,

18

Saxon is entitled to summary judgment on the Bordens' TILA claims.

Next, the Court finds the Bordens are barred from asserting a claim for damages against Deutsche pursuant to the one-year statute of limitation imposed by 15 U.S.C. § 1640(e). That provision provides in part that, "[a]ny action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation." The date of the occurrence of the violation in this case was, at the very latest, the date of the loan closing on September 21, 2006. See In re Smith, 737 F.2d 1549, 1552 (11th Cir. 1984). The Bordens did not initiate this lawsuit until July 2008. As the Bordens do not contest Defendants' assertion that any claims for damages are time-barred, but rather only claim they are entitled to rescission of the loan, the Court finds the Bordens' claims for damages under TILA are time-barred and Deutsche is entitled to summary judgment.

Finally, the Court finds Defendants are entitled to summary judgment on the Bordens' claim for rescission under the TILA. Under the relevant provisions of the TILA, consumers may exercise their right to rescind a loan within three business days of consummation of the transaction. See 15 U.S.C. § 1635; 12 C.F.R. § 226.23(3). The regulations provide that, "[i]f the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first." 12 C.F.R. § 226.23(3). Furthermore, "[t]he term 'material disclosures' means the required disclosures of the annual percentage

rate, the finance charge, the amount financed, the total of payments, the payment schedule, and the disclosures and limitations referred to in §§ 226.32(c) and (d) and 226.35(b)(2)." Id.

The Bordens argue their right to rescind also applies to Deutsche as the assignee of the loan because the violations are apparent on the face of the disclosure statement.[10]  They also argue they have only just now received the "Right to Cancel" document as it was just now produced by Defendants.  The Bordens additionally claim that the "Statement of Non-Rescission" form included in the closing packet was also so misleading as to preclude them from having received clear, conspicuous, and accurate notice of their right to rescind.  The Bordens allege these violations were apparent on the face of the loan documents.  Furthermore, the Bordens argue that any statute of limitations should be equitably tolled in light of the misleading nature of the "Statement of Non-Rescission" document.  All of the Bordens' arguments fail.

First, the TILA Disclosure Statement dated September 21, 2006, contains all of the

---

[10]    15 U.S.C. § 1640(a) sets out the liability of assignees and states:

Except as otherwise specifically provided in this title [15 USCS §§ 1601 et seq.], any civil action for a violation of this title [15 USCS §§ 1601 et seq.] or proceeding under section 108 [15 USCS § 1607] which may be brought against a creditor may be maintained against any assignee of such creditor only if the violation for which such action or proceeding is brought is apparent on the face of the disclosure statement, except where the assignment was involuntary. For the purpose of this section, a violation apparent on the face of the disclosure statement includes, but is not limited to (1) a disclosure which can be determined to be incomplete or inaccurate from the face of the disclosure statement or other documents assigned, or (2) a disclosure which does not use the terms required to be used by this title [15 USCS §§ 1601 et seq].

material terms the Bordens allege were never disclosed.  The TILA Disclosure Statement

discloses the amount financed as $293,340.  (See D.E. 112-13.)  It discloses the finance

charge as $622,672.72.  (Id.)  It further discloses the annual percentage rate of 9.862% and

defines it as "not the Note rate for which the borrower applied.  The Annual Percentage Rate

(APR) is the cost of the loan in percentage terms taking into account various loan charges of

which interest is only one charge. . . . The APR is calculated by spreading these charges over

the life of the loan which results in a rate generally higher than the interest rate shown on

your Mortgage/Deed of Trust."  (Id. at 1-2.)  It discloses the number, timing, and amounts

of the payments scheduled.  (Id. at 1.)  It disclosed the total amount of payments as $916,

012.72.  (Id.)  Because the Bordens were receiving a thirty-year fixed rate loan, the TILA

Disclosure Statement did not indicate any variable rate feature.  (Id.)  Finally, the TILA

Disclosure Statement is signed by both William and Marolie Borden and dated September

21, 2006.  The Bordens have not offered evidence of any TILA disclosure violations or that

these violations are apparent on the face of the loan documents.  Moreover, the Bordens have

not offered any evidence that the loan origination file contains any other documents or

indications that the disclosures of this loan were incomplete or inaccurate.

Second, the Bordens claims based upon the date of production of the Notice of Right

to Cancel document also fail.  Defendants recently produced the Notice of Right to Cancel

form, dated September 21, 2006, and executed by William Borden.  (See D.E. 113-1.)  The

Notice of Right to Cancel is clear and conspicuous in its advisement of the borrower's rights

to cancel.  See Veale v. Citibank, F.S.B., 85 F.3d 577, 581 (11th Cir. 1996).  Although the Bordens assert that the Statement of Non-Rescission was intentionally misleading and confused them into thinking they had waived their right to rescind under the Notice of Right to Cancel, they have not filed an executed version of the Statement of Non-Rescission or set forth any proof that they signed the document on the closing date, aside from their own testimony. (See D.E. 113-10.)  Defendants say the only form produced in this case thus far is unsigned by any party.  The form itself is not misleading in any event, with or without the Notice of Right to Cancel.

Third, the Court finds that the Bordens' right to rescind is time-barred.  The closing took place on September 21, 2006.  They did not execute their right to rescind within three business days and have offered no valid basis for extending the rescission period to three years.  As discussed above, the Bordens have not demonstrated that any required notice or material disclosures were not delivered at that time.  The Notice of Right to Cancel form was executed on the closing date.  The date of its production in this litigation is irrelevant.  Accordingly, Defendants are entitled to summary judgment on the Bordens' TILA claims.

**B.     Florida Deceptive and Unfair Trade Practices Act**

The FDUTPA prohibits, "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.204(1).  Furthermore, "[a]ny person who is willfully using, or has willfully used, a method, act, or practice in violation of this part, which method, act, or practice

22

victimizes or attempts to victimize senior citizens or handicapped persons, and commits such violation when she or he knew or should have known that her or his conduct was unfair or deceptive, is liable for a civil penalty of not more than $ 15,000 for each such violation." FLA. STAT. § 501.2077(2).  For purposes of this section, "senior citizen" means a person who is 60 years of age or older.  FLA. STAT. § 501.2077(1)(a).

The Court finds summary judgment is appropriate on the Bordens' FDUTPA claims. It is undisputed that the statutory provision involving violations against senior citizens would only apply to William Borden, as Marolie was 59 years of age at the time of the loan transaction.  More importantly, the Bordens have not demonstrated any facts supporting a FDUTPA claim against either Saxon or Deutsche.  The Complaint alleges Atlantic Pioneer deceived them into believing they could refinance their home at an attractive interest rate and save money.  (Complaint at ¶ 89.)  The Complaint further alleges the Defendants failed to provide accurate disclosures at the closing.  (Id. at ¶ 90.)  Additionally, the Complaint alleges the Defendants changed the terms of the loan at the closing.  (Id. at ¶ 91.)  Nevertheless, it is undisputed that Saxon and Deutsche were not involved in the loan transaction and only became associated with the loan much later.  To the extent the Bordens argue that Saxon's alleged debt collection violations also constitute deceptive acts under FDUTPA, such a claim is unsubstantiated and without merit.  Simply put, the Bordens do not allege any facts demonstrating or even suggesting Saxon or Deutsche had any involvement in the deceptive or unfair trade practices they allege.  As a result, summary judgment is appropriate for

23

Defendants on these claims.

### C.   Civil RICO

The Court finds summary judgment is appropriate as to the Bordens' civil RICO claim under Fla. Stat. §§ 772.101, *et seq.*  First, as noted by Defendants, the Bordens failed to file any Civil RICO Case Statement pursuant to S.D. Fla. Local Rule 12.1, and the claim is deficient in that regard.  See Walker v. Hallmark Bank & Trust, Ltd., 2010 U.S. Dist. LEXIS 29202 at *13-14 (S.D. Fla. Mar. 27, 2010).  Second, the Bordens have failed to make even a minimal showing as to how any of the defendants committed acts in violation of the statute.  Rather, the Complaint states, "[t]he prohibited acts committed by the Defendants are enumerated in Florida Statutes § 772.102(22), and relate to fraudulent practices, false pretenses, and fraud generally" and "[o]ne need only read the newspaper to learn of a multitude of additional cases that are similar in nature." (Complaint at ¶¶ 94-95.)  While that last statement may be true, it certainly falls short of alleging facts supporting a civil RICO claim.  In response to Defendants' Motion, the Bordens seemingly again concede the lack of any claim and merely direct the Court to consider whether the elements of a RICO claim are met.  The Court has considered the Bordens' claim and has determined that there are no genuine issues of material fact and Defendants are entitled to judgment as a matter of law on this claim.

### D.   Intentional Infliction of Emotional Distress

Florida courts have recognized the tort of intentional infliction of emotional distress

but have only found liability where the alleged conduct is so outrageous in character, and so extreme in degree, so as to go beyond all possible bounds of decency.  See Metropolitan Life Ins. Co. v. McCarson, 467 So.2d 277, 278-79 (Fla. 1985).  "The elements of this cause of action are (1) the wrongdoer's conduct was intentional or reckless, that is, he intended his behavior when he knew or should have known that emotional distress would likely result; (2) the conduct was outrageous, that is, as to go beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized community; (3) the conduct caused the emotional distress; and (4) the emotional distress was severe."  Dominguez v. Equitable Life Assurance Soc'y of the United States, 438 So.2d 58, 59 (Fla. 3d DCA 1983), aff'd sub nom., Crawford & Co. v. Dominguez, 467 So.2d 281 (Fla. 1985).  Moreover, merely asserting legal rights in a legally permissible way does not rise to the level of outrageous conduct necessary to sustain a claim of intentional infliction of emotional distress.  See McCarson, 467 So.2d at 279.

The Court finds Defendants are entitled to summary judgment on the Bordens' claim for intentional infliction of emotional distress.  As to Deutsche, it is undisputed that its only contact with the Bordens was through the July 2008 foreclosure letter.  (See M. Borden Dep., D.E. 112-2 at 121.)  William Borden testified that the foreclosure letter did not contain any abusive language or threats but only stated that if he did not pay his mortgage payments the Bordens would lose their house.  (See W. Borden Dep., D.E. 113-4 at 2-5.)  The Bordens also expected the foreclosure letter in light of their missed payments.  (See M. Borden Dep., D.E.

25

112-2 at 151.)   William Borden also testified that he did not experience any medical problems after receiving the foreclosure letter but that the incident in which he thought he had a heart attack occurred later.  (See D.E. 116 at 19-20.)  The hospital records indicate William was admitted to the hospital on July 16, 2008, and discharged the very next day. (See D.E. 113-8 at 11.)  Marolie Borden testified they received the foreclosure letter on July 18, 2008.  (M. Borden Dep., D.E. 117 at 121.)  His medical records also indicate he did not suffer a heart attack.  (D.E. 113-8, 113-9.)  They also mention a history of diabetes and heart disease.  (Id.)  In short, the Bordens do not raise any facts coming close to the sort of outrageous conduct necessary for an intentional infliction of emotional distress claim based upon the foreclosure letter.   The Bordens also do not raise any facts supporting the conclusion that the letter caused any distress or that the distress was severe.

The Bordens allege for the first time in their Response that the Defendants' outrageous conduct includes the trespass on their property and the harassing telephone calls. During her testimony regarding the nature of the phone calls, Marolie Borden stated the Saxon employees who called her were impolite because they sometimes called during non-business hours, likely because they were located in Texas.  (M. Borden Dep., D.E. 117 at 40-41.)  She stated they told her that her payments were late but admitted no one yelled at her. (Id.)  Marolie Borden reiterated that her frustration really was due to the frequency and time of the calls, but stated no one yelled at her and those who called were not "impolite."  (Id. at 46-47.)  Several times she reiterated that nothing the callers said was harassing or impolite.

26

(Id. at 49-50.)   With regard to the alleged trespass, Marolie Borden testified that approximately three weeks after receiving the foreclosure letter she noticed a woman on her property taking photographs of their house.  (Id. at 154-55.)  She described what transpired as follows.  She first noticed the woman while she was in her living room.  Upon confronting the woman, the woman identified herself as "from the mortgage company."  (Id. at 155.)  The woman was standing on the grass on the Borden's front lawn.  When Marolie Borden asked the woman why she was on the property, the woman just walked to her car and drove off. (Id. at 156-57.)  Marolie Borden admitted she did not feel intimidated by the woman and did not ask her to leave.  (Id. at 157.)  Immediately after the woman left, Marolie Borden went inside her home and called her attorney.  (Id. at 159.)  She then described crying and having a panic attack.  (Id. at 160-164.)  When asked whether her panic attack was caused by the woman on her property or "the entire situation," Marolie Borden admitted that it was due to the entire situation.  (Id. at 163, 170.)  She did not see a physician after the panic attack and she regained her calm shortly thereafter.  (Id. at 167-69.)

The Court finds summary judgment is also appropriate as to the Bordens' claims for intentional infliction of emotional distress related to the telephone calls by Saxon and the mysterious visit from the woman taking photographs of their house.  The Bordens do not allege any facts demonstrating Saxon's phone calls constituted outrageous conduct and admitted being more annoyed and frustrated by the timing and frequency of the calls.  They also do not allege the phone calls caused any severe emotional distress.  With regard to the

alleged trespass, there is no evidence that the woman who visited the Bordens' home and took photographs was affiliated with either Saxon or Deutsche, aside from Marolie Borden's testimony that the woman identified herself as "from the mortgage company." The incident took place sometime in the late afternoon or early evening and the Bordens do not allege any facts other than the woman was taking photographs and then abruptly left. They did not allege feeling intimidated and the first thing Marolie Borden did was call her attorneys, suggesting the incident itself did not cause any overwhelming immediate distress. Moreover, Marolie Borden admitted her panic attack was caused by the foreclosure and the whole situation they found themselves in. As a result, the Court finds there are no genuine issues of material fact and Defendants are entitled to summary judgment on the Bordens' claims of intentional infliction of emotional distress.

### E.    Conspiracy to Commit Fraud

In Florida, "[a] civil conspiracy requires: (a) an agreement between two or more parties, (b) to do an unlawful act or to do an unlawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." Raimi v. Furlong, 702 So.2d 1273, 1284 (Fla. 3d DCA 1997). "Additionally, an actionable conspiracy requires an actionable underlying tort or wrong." Id. While a civil conspiracy can be proven by circumstantial evidence, "this may be done 'only when the inference sought to be created by such circumstantial evidence outweighs all reasonable inferences to the contrary.'" Id. (quoting Diamond v. Rosenfeld,

28

511 So.2d 1031, 1034 (Fla. 4th DCA 1987), <u>rev. denied</u>, 520 So.2d 586 (Fla. 1988)).

The Complaint alleges all the defendants were part of a common scheme or plan to defraud the Bordens of their home and charge them exorbitant amounts of interest.  (<u>See</u> Complaint at ¶ 123.)  The Bordens allege the defendants participated in a venture to induce innocent homeowners to borrow funds at exaggerated interest rates and with negative terms.  (<u>Id.</u> at ¶ 124.)  The Complaint further alleges Master Financial, Saxon, and Deutsche "aided, abetted, counseled, commanded, induced, and procured the commission of predatory lending practices through their knowingly financing the predatory lending" of Atlantic Pioneer.  (<u>Id.</u> at ¶ 125.)  Yet, the Bordens have offered no facts demonstrating any type of agreement between Saxon or Deutsche and those alleged to have committed the fraud.  The Bordens have not set forth any facts, either in their Response or in the Complaint, that demonstrate a genuine issue of material fact as to whether an agreement existed.  Second, as discussed below, the Bordens have not demonstrated any factual issues exist as to the underlying fraud.  Therefore, the requirement of an actionable underlying tort or wrong is not present.  The record is completely devoid of any facts demonstrating Saxon or Deutsche entered into an agreement with Atlantic Pioneer or Master Financial to defraud the Bordens or that Saxon or Deutsche undertook any acts in furtherance of said conspiracy.  As a result, the Court finds no issues of material fact exist as to the Bordens' conspiracy claims and Defendants are entitled to judgment as a matter of law.

F.      Fraud

The Complaint alleges Atlantic Pioneer intentionally made false statements in order to induce the Bordens to purchase the loan. (Complaint at ¶¶ 128-30.) The false representations made by Atlantic Pioneer constituted the following: (a) their interest rate would be 8.5%; (b) the loan was a good product for the Bordens; (c) the Bordens would be able to pay off the loan; and (d) the Bordens would be able to refinance the loan. (Id. at ¶ 132.) The Bordens allege they relied upon these false statements and Atlantic Pioneer defrauded them of their home. (Id. at ¶¶ 129, 133.) The Complaint seeks relief against Saxon and Deutsche but does not allege any facts illustrating their involvement in the fraud.

The Court finds summary judgment is appropriate on the Bordens' fraud claims. The Bordens have not offered any facts demonstrating that either Saxon or Deutsche made any false statements. Again, Deutsche only had a single communication with the Bordens (either oral or written). The Bordens further testified they did not think Saxon or Deutsche told them anything that was untrue. (M. Borden Dep., D.E. 117 at 144-47; W. Borden Dep., D.E. 116 at 30-31 (stating Saxon and Deutsche "haven't told me anything that is not true.").) Rather, they view Master Financial and Atlantic Pioneer as having "started this whole mess." (M. Borden Dep., D.E. 117 at 145.) Moreover, some of the alleged false statements such as the opinion that the loan would be good for the Bordens do not necessarily support an action for fraud. Finally, the Bordens do not provide any authority for holding Saxon and Deutsche liable for any fraudulent statements made by Atlantic Pioneer or any facts suggesting the

30

Defendants were aware of the fraud or had any involvement other than purchasing the loan well after the alleged fraud had occurred.  As a result, the Court finds no issues of fact exist and summary judgment is appropriate as to the Bordens' fraud claims.

### G.    Rescission

The Complaint seeks rescission of the mortgage on the grounds that they relied upon fraudulent representations made by Atlantic Pioneer and no adequate remedy at law exists. (Complaint at ¶¶ 135-36, 143.)  As addressed above, the Bordens fail to set forth any facts demonstrating Saxon or Deutsche's involvement in making false statements or inducing them into entering the loan transaction.  Moreover, adequate remedies at law do exist as evidenced by the fact that the Bordens have already obtained default final judgments against Atlantic Pioneer and Master Financial in the amount of the difference between the loan they say they were promised and the loan they received.  Accordingly, summary judgment is appropriate for Defendants on the Bordens' rescission claim.

### H.    Florida Consumer Collection Practices Act

The FCCPA provides that, "[i]n collecting consumer debts, no person shall: . . . [w]illfully communicate with the debtor or any member of her or his family with such frequency as can reasonably be expected to harass the debtor or her or his family, or willfully engage in other conduct which can reasonably be expected to abuse or harass the debtor or any member of her or his family."  FLA. STAT. § 559.72(7).  The Act defines a "debt collector" as:

"Debt collector" means any person who uses any instrumentality of commerce within this state, whether initiated from within or outside this state, in any business the principal purpose of which is the collection of debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. The term "debt collector" includes any creditor who, in the process of collecting her or his own debts, uses any name other than her or his own which would indicate that a third person is collecting or attempting to collect such debts. The term does not include:

***

(f) Any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent that such activity is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement; concerns a debt which was originated by such person; concerns a debt which was not in default at the time it was obtained by such person; or concerns a debt obtained by such person as a secured party in a commercial credit transaction involving the creditor.

FLA. STAT. § 559.55.

The Bordens seek damages from Saxon in connection with the alleged trespass by the woman taking photographs on the Bordens' property.  The Complaint states that on or about July 17, 2008, the Bordens discovered Saxon's agent on their property taking photographs without their permission.  (Complaint at ¶¶ 145-47.)  The Complaint further alleges Saxon's conduct was willful and harassing.  (Id. at ¶ 151.)  Finally, the Complaint states, "[t]he taking of the photographs, coupled with the announcement that the agent was there on behalf of SAXON, is precisely the type of harassment that § 559.72, Florida Statutes, seeks to prevent."  (Id. at ¶ 154.)  The Complaint does not mention any facts related to Saxon's telephone calls with the possible exception of its statement that, "SAXON has made many attempts to collect on the consumer debt it alleges is owed by the BORDENS."  (Id. at ¶ 148.)  As stated previously, Saxon argues that it is not a "debt collector" based on the

32

FCCPA's exception for those collecting their own debt or debts that were not in default at the time they were obtained.  In response, the Bordens state that while Saxon "may or may not fall within the de jure standard of 'debt collector' provided for" in the statute, Saxon should be considered "a de facto 'debt collector'" based upon its representing itself as a debt collector.

The Court finds Saxon is entitled to summary judgment on the Bordens' FCCPA claims.  First, the Bordens have failed to offer any evidence that Saxon fits within the definition of a "debt collector" under the FCCPA.  The Bordens have offered no evidence regarding whether Saxon "uses any instrumentality of commerce within this state, whether initiated from within or outside this state, in any business the principal purpose of which is the collection of debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  The Bordens have also offered no evidence to rebut Defendants' position that the exception outlined in FLA. STAT. § 559.55(f) does not apply.  Furthermore, the Bordens allege Saxon holds itself out as a "debt collector" on its website and on certain undisclosed documents, but do not cite to any documents in the record or provide any examples.  Thus, their argument that Saxon should be considered a de facto debt collector is completely unsupported.  Additionally, Defendants cite to a number of cases within this Circuit that have found loan and mortgage servicers do not fall within the analogous federal statute's definition of "debt collector."  Hennington v. Greenpoint Mortgage Funding, Inc., 2009 WL 1372961 at *6 (N.D. Ga. 2009); Bates v.

Novastar/Nationstar Mortgage LLC, 2008 WL 2622810 at *5-6 (N.D. Ga. 2008); Humphrey v. Washington Mutual Bank, F.A., 2007 WL 1630639 at *2 (N.D. Ga. 2007).  Even assuming Saxon fit within the definition of a "debt collector" under the FCCPA, the Bordens have failed to offer any facts demonstrating the alleged trespass was in the course of collecting a debt.  Although Marolie Borden testified that the woman identified herself as "from the mortgage company," there is no additional evidence that this person was employed by Saxon or that the actions of taking photographs was in furtherance of collecting a debt. Additionally, the loan had already been referred to foreclosure by that time.  Finally, to the extent that the Bordens pleadings can be construed to assert a claim based upon Saxon's telephone calls, these claims would also fail for the reasons stated above.  As a result, Defendants are also entitled to summary judgment on the Bordens' FCCPA claims.

### V.      Conclusion

Defendants Saxon Mortgage Services, Inc., and Deutsche Bank National Trust Company, as Trustee for NATIXIS 2007-HE2, are entitled to summary judgment on all counts of Plaintiffs' Complaint.  Accordingly it is hereby **ORDERED AND ADJUDGED** that:

1.      Defendants' Motion for Summary Judgment (D.E. 109), filed on September 17, 2009, is **GRANTED**;

2.      Defendants' Motion to Strike Jury Trial (D.E. 129), filed on November 5, 2009, Defendants' Motion to Strike Expert Report of Marlowe C. Moreland

(D.E. 127), filed on October 21, 2009, and Plaintiffs' Motion <u>in Limine</u>

regarding permissible evidence pertaining to Moreland (D.E. 134), filed on

November 30, 2009, are **DENIED AS MOOT**.

    **DONE AND ORDERED** in Chambers at Miami, Florida, this 28th day of September,

2010.

                                      *Joan A. Lenard*

                                   **JOAN A. LENARD**
                                   **UNITED STATES DISTRICT JUDGE**